IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA,

| | |
|---|---|
| CARLA A. LYONS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 11-cv-246-TLW |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Carla A. Lyons, pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c), requests judicial review of the decision of the Commissioner of the Social Security Administration denying her disability benefits under Titles II and XVI of the Social Security Act ("Act"). In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before the undersigned United States Magistrate Judge. (Dkt. # 9).

**Introduction**

When applying for disability benefits, a plaintiff bears the initial burden of proving that he or she is disabled. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). The evidence establishing a disability must come from "acceptable medical sources" such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

**Background Information**

Plaintiff, Carla A. Lyons, then a fifty year old female, applied for Title II and Title XVI

disability benefits on September 9, 2008, alleging an onset date of May 1, 2007.[1] (R. 123-25, 126-29). Plaintiff alleged severe impairments of schizophrenia, depression, a speech impediment, asthma, and bowel/bladder problems prevented her from working. (R. 64-67, 68-72). Plaintiff's claim was denied initially on December 31, 2008, and on reconsideration on April 28, 2009. (R. 60-63). Plaintiff received a hearing before an administrative law judge ("ALJ") on March 1, 2010. (R. 25-59). The ALJ issued his decision denying plaintiff benefits on March 22, 2010. (R. 9-24). After the Appeals Council declined to review plaintiff's case, plaintiff filed this appeal. (R. 1-6; Dkt. # 2).

On appeal, plaintiff raises three points of error. First, plaintiff argues that the ALJ improperly relied on the Medical-Vocational Guidelines ("the grids") to determine that she was not disabled at step five. Second, plaintiff argues that the ALJ erred in analyzing the medical source evidence. Finally, plaintiff argues that the ALJ failed to properly assess plaintiff's credibility.

## **The ALJ's Decision**

The ALJ determined that plaintiff had severe impairments of hypertension, abdominal pain, hernias, and depression. (R. 14). After reviewing plaintiff's impairments and conducting the special technique for plaintiff's mental impairment, the ALJ concluded that plaintiff did not meet or medically equal a listing. (R. 14-16). The ALJ then assessed plaintiff's residual functional capacity.

Plaintiff testified that she was receiving mental health treatment and medication management. (R. 17). The ALJ found that plaintiff's treatment program worked to "take away most of her problems." Id. Plaintiff testified that she still suffered some difficulties "but could

---

[1] Plaintiff had previously applied for disability benefits and had been denied initially in May 2006. (R. 149). Because the record contains no further information on this first claim, the undersigned concludes that plaintiff did not appeal that decision.

3

not identify what the problems were." Id. The ALJ reviewed several of plaintiff's mental health records, including one from September 2008 which showed that plaintiff's medications were controlling her symptoms. Id.

The ALJ also reviewed opinions from the agency's consultative non-examining physicians and from plaintiff's treating physician, Dr. John Mallgren, with respect to plaintiff's mental status. (R. 18). The consultative non-examining physicians found that plaintiff had moderate limitations in activities of daily living and in maintaining concentration, persistence, or pace. Id. These physicians also found that plaintiff had experienced one or two episodes of decompensation. Id. Dr. Mallgren's opinion, also signed by plaintiff's case manager, discussed plaintiff's activities of daily living and concluded that plaintiff could understand, remember, and carry out simple instructions. Id. The ALJ also discussed an undated Mental Residual Functional Capacity form completed by plaintiff's care manager, finding that plaintiff had marked limitations in ten of nineteen categories. Id. The ALJ found that this opinion, however, was not supported by the objective medical evidence, which included medication refill records. Id.

The ALJ concluded that plaintiff's subjective complaints were inconsistent with her own reports of her activities of daily living and with the medical evidence. (R. 18-19). The ALJ found that plaintiff could "perform the full range of medium work"[2] with the following limitations: (1) "simple tasks with routine supervision;" and (2) "no continuous contact with the general public." (R. 16). Based on plaintiff's residual functional capacity, the ALJ determined that plaintiff could

---

[2] The ALJ considered plaintiff's medical records addressing her physical impairments, as well as her subjective complaints, and ultimately adopted the findings of the agency's consultative, non-examining physician. (R. 17-18). Plaintiff has not challenged the ALJ's findings with respect to plaintiff's physical capacity to perform work, except for general allegations that the ALJ failed to consider plaintiff's pain and asthma. (Dkt. # 13 at 2-3). The ALJ did consider the fact that plaintiff complained of abdominal pain whenever she performed certain household chores, as well as plaintiff's complaints of twice-weekly, brief asthmatic episodes. (R. 17). However, the ALJ found no limitations resulting from those subjective complaints, other than, perhaps, the finding that plaintiff could perform only medium work, when she had previously performed heavy work. (R. 16, 50).

4

not return to her past relevant work as a nurse assistant because the work was "semi-skilled." (R. 19). The ALJ then applied the grids and found that, because plaintiff could perform the full range of medical work, Rule 203.29 of the grids "directed" a finding of not disabled. (R. 19-20).

### Plaintiff's Medical Records

Plaintiff was hospitalized in December 2005 after she sought treatment at an emergency room for depression and suicidal ideations. (R. 228-35). Plaintiff complained of anxiety, unclear thinking, and auditory hallucinations. Id. Plaintiff was transferred to a mental facility and then referred to Grand Lake Mental Health Center ("Grand Lake"). (R. 228-35, 312-15, 324). Plaintiff's first assessment with Grand Lake occurred in early January 2006. (R. 323-27). At that time, plaintiff was diagnosed with "Schizoaffective Disorder, Depressed Type." (R. 323).

Plaintiff was anxious and depressed during her initial assessment at Grand Lake. (R. 326). She showed "evidence of some disorganized thinking with difficulty keeping her concentration." Id. Plaintiff also reported some auditory and visual hallucinations. Id. Grand Lake set up a treatment plan for plaintiff to receive group and individual therapy, case management, and medication management on a monthly basis. Id. Grand Lake estimated that plaintiff would require one year of treatment." Id.

The following month, plaintiff reported that she was doing well on her medications and wanted to move from monthly to quarterly visits. (R. 311). Her treating physician, Dr. Mallgren, agreed. Id. Plaintiff had increased depressive symptoms in April 2006, but following a medication adjustment, she continued to improve and had her medications decreased over time. (R. 305-10). By the time of her alleged onset disability date, May 1, 2007, plaintiff requested that Dr. Mallgren reduce her medication again. (R. 304). At her appointment on May 10, 2007, Dr.

Mallgren noted, "[plaintiff] wants to get off the Prozac[3] completely. Says she is doing well with just the Risperdal.[4] This is pretty impressive, that she had been a caretaker for a disabled gentleman for the last year, and he has passed, and she is coping quite well." (R. 304). Dr. Mallgren discontinued plaintiff's Prozac in August 2007, so that plaintiff was taking only Risperdal and Wellbutrin XL.[5] (R. 303).

Within six weeks, plaintiff's depressive symptoms returned without the Prozac, so Dr. Mallgren again adjusted plaintiff's medication to add Lamictal.[6] (R. 301). Plaintiff improved quickly, and Dr. Mallgren discontinued Lamictal just two months later. (R. 300). At this point, plaintiff appeared more stable. Throughout 2008, plaintiff complained of depression only once, in May 2008. (R. 295). With a medication adjustment, plaintiff again improved. (R. 291). Thereafter, plaintiff reported that her symptoms were controlled with medication and that she suffered no side effects. (R. 281-90, 429-442). Plaintiff did complain that she was "spacing out" in November 2008, and Dr. Mallgren opined that this symptom could be due to either "disassociation or poor concentration as a result of a [sic] residual depressive symptoms." (R.

---

[3] Prozac is prescribed to treat depression and is in a class of prescription drugs known as "selective serotonin reuptake inhibitors (SSRIs). It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000885/ (last visited on September 10, 2012).

[4] Risperdal, also called Risperidone, "is an antipsychotic medication used to treat mental illnesses including schizophrenia, bipolar disorder, and irritability associated with autistic disorder." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000944/ (last visited on September 10, 2012).

[5] Wellbutrin XL is an antidepressant that "works by increasing certain types of activity in the brain." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000970/ (last visited on September 10, 2012).

[6] Lamictal is an anti-seizure medication that can also be used "to increase the times between episodes of depression" or mania in bipolar patients.
http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000957/ (last visited on September 10, 2012).

451). Plaintiff's symptoms resolved quickly, however, when Dr. Mallgren added Abilify.[7] (R. 443). Plaintiff continued to receive treatment even after the ALJ's decision issued in March 2010. (R. 634-47). Plaintiff continued to report that her medication worked well and that she suffered no side effects, although she "still has times she thinks TV or radio is on." (R. 634-38).

Plaintiff's counseling sessions yielded less positive reports. Plaintiff presented for therapy with a depressed mood from the beginning of her treatment through August 2007. (R. 339-357). Plaintiff experienced a lack of motivation, struggled with mood swings, and suffered bouts of anxiety. Id. Plaintiff reported that she regularly attended Alcoholics Anonymous ("AA") meetings as a way to cope with her depressive symptoms, but her case manager did not believe that plaintiff was making good progress. Id.

Plaintiff's mood improved after August 2007. In October 2007, plaintiff reported that she had taken a job as a caretaker and was doing "okay." (R. 337). In March 2008, plaintiff told her case manager that she was having a "good day" because she had just attended an AA meeting. (R. 333). Plaintiff stated that she needed "to find a job and earn an income" and that she had "gone to Workforce Oklahoma" and looked at job advertisements in the paper. Id. Plaintiff's case manager reported regularly that plaintiff had "poor social skills." (R. 328-32).

Plaintiff subsequently failed to comply with individual therapy, but she returned to her sessions in late summer 2009. (R. 551-67, 554). In August 2009, plaintiff reported that she was "okay" and denied having any immediate problems. (R. 562). In later sessions, plaintiff reported relationship problems with her children, but she continued to report that she was "okay" and presented at sessions with a positive mental state. (R. 559-61, 563-68). Plaintiff also stated that she worked as a caretaker for her mother and step-father and improved her mood by being

---

[7] Abilify can treat both depression, in combination with other antidepressants, and schizophrenia "by changing the activity of certain natural substances in the brain." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221/ (last visited on September 10, 2012).

creative and engaging in crafting activities, such as sewing and jewelry making. (R. 564, 565, 567). Shortly after the ALJ's decision issued in March 2010, plaintiff reported that she still struggled with depressive symptoms and concentration issues, although she believed her depression was improved. (R. 642).

In addition to these medical records, Dr. Mallgren signed a mental status form in April 2009 and a second form in February 2010. (R. 478, 527). Both forms appear to have been completed by the case manager, but they both bear Dr. Mallgren's signature. In April 2009, Dr. Mallgren reported that plaintiff demonstrated depressive symptoms and "withdrawing behaviors," "difficulty concentrating and focusing, and difficulty processing information." (R. 478). She could, however, relate to others and "remember, comprehend and carry out" simple instructions. Id. Dr. Mallgren stated that plaintiff could not handle working "at this time." Id. In February 2010, plaintiff exhibited similar symptoms but showed signs of improvement. (R. 527-28). Dr. Mallgren's opinion stated that plaintiff could follow simple instructions and could work "possibly for a short time period." (R. 528). He explained that "there is indication of periods of decompensation that would prevent ability to respond appropriately in these areas [work pressure, supervision, and co-workers] that would be expected to last more than a week at a time." Id.

Finally, the medical records contain an unsigned,[8] undated Mental Residual Functional Capacity Assessment. (R. 529-30). The form states that plaintiff has marked limitations in ten of nineteen areas related to "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation." Id. Plaintiff was given marks of moderate limitation in the remaining areas. Id.

---

[8] The form is not signed by Dr. Mallgren, but it does bear the case manager's signature.

**The ALJ Hearing**

The ALJ held a hearing on March 1, 2010. (R. 25-59). Plaintiff testified that she had previously worked as a nurse, most recently as a caregiver for an elderly lady with Alzheimer's disease. (R. 30-31). Plaintiff's duties included sitting with the patient and helping prepare meals. Id. Plaintiff testified that she could not find a similar job, although she also testified that she had not looked for work. (R. 31, 38). Plaintiff also stated that she could not return to nursing due to a felony conviction for child endangerment. (R. 33). Plaintiff also testified that she did not feel qualified to work as a nurse because she had difficulty staying awake and with concentration. (R. 32).

Plaintiff began treatment with Dr. Mallgren at Grand Lake in 2005. (R. 38). Plaintiff told the ALJ that she was stable on her medications, stating that she did not feel "quite right but I'm up there where I'm hoping to be. I feel like I need a little bit more but I'm afraid to take any more." (R. 40-41). Plaintiff explained that her medications kept her calm and still allowed her to get out of the house more often and to accomplish tasks. (R. 41). Plaintiff described her experiences with hearing voices at the beginning of her treatment and stated that sometimes she hears noises "like there's a TV on but not like I used to." (R. 42). Overall, plaintiff stated that her medications "took away" most of her issues, but she still felt "like I'm not as good as other people, like I'm in my own little corner and I'm not like anybody else, I'm different." (R. 43). The only side effect of her medication was dry mouth, caused by a "muscle relaxer." Id.

Plaintiff also described her physical symptoms. Once or twice a week, she would have an asthmatic episode, where she felt "a bubble" in her chest that expanded and caused difficulty breathing. (R. 45). Those episodes lasted approximately five minutes. Id. Plaintiff could do laundry and dishes without difficulty, although she sometimes stopped to rest during those chores. (R. 48-49). Plaintiff could not sweep, mop, or vacuum because it hurt her stomach – the

location of her hernias. (R. 44, 49). Plaintiff also testified that she went to the bathroom approximately twenty times per day because of her hernias. (R. 43-44).

The vocational expert testified that plaintiff had held two jobs that qualified as past relevant work. (R. 50). Plaintiff had worked as a certified nurse's assistant, which qualified as medium work with an SVP of four, although plaintiff reported it as heavy work. Id. Plaintiff also worked as a home health aide, which qualified as medium work with an SVP of three, although plaintiff performed it at the light level. Id.

The ALJ then posed a hypothetical to the vocational expert: If plaintiff were limited to medium work with simple tasks and no continuous contact with the public, could she perform her past relevant work? (R. 51). The vocational expert testified that the limitation to simple tasks would prevent plaintiff from returning to her past work because it qualified as semi-skilled work rather than unskilled work. Id. The vocational expert stated, however, that plaintiff could perform other unskilled jobs at the medium and light levels, such as a hand packer, bus person, bench assembler, and motel housekeeper. (R. 51-52). The vocational expert opined that any environmental limitations due to plaintiff's asthma would not affect any of the jobs cited, except perhaps the motel housekeeper job. (R. 52-53). Even then, the vocational expert did not believe that the associated exposure to cleaning agents would rise to the level of "concentrated exposure." (R. 53).

Plaintiff's attorney then asked the vocational expert to consider the limitations of the unsigned, undated mental residual functional capacity assessment. (R. 54-55). The vocational expert testified that plaintiff would not be able to perform any work with those limitations. (R. 56). The vocational expert also testified that plaintiff would not be able to work if she considered plaintiff's subjective complaints to be true, due to her need for multiple restroom breaks and her inability to concentrate. (R. 57-58).

## ANALYSIS

Plaintiff raises three issues on appeal. First, plaintiff argues that the ALJ improperly used the grids at step five to determine that plaintiff was not disabled. Second, the ALJ failed to properly weigh the opinions of plaintiff's treating physician in determining plaintiff's residual functional capacity and did not consider plaintiff's GAF scores. Finally, the ALJ failed to conduct a proper credibility analysis, relying on boilerplate language and failing to consider plaintiff's complaints of pain and the side effects of her medications.

### Use of the Medical-Vocational Guidelines ("the Grids")

At step four, the ALJ found that plaintiff could perform the full range of work with two nonexertional limitations. (R. 16). Plaintiff was restricted to simple tasks and could not have continuous contact with the general public. Id. At step five, the ALJ applied the grids and determined that Rule 203.29 directed a finding that plaintiff was not disabled. (R. 19). Plaintiff argues that these nonexertional limitations prevented the ALJ from relying solely on the grids in determining that plaintiff was not disabled. (Dkt. # 13 at 2-3). The Commissioner concedes that the ALJ made a "technical error" in relying on the grids but states that the error was harmless due to the fact that the ALJ proposed a proper hypothetical to the vocational expert during the hearing; therefore, the record contains substantial evidence to support the finding that plaintiff was not disabled. (Dkt. # 15 at 3-4). The Commissioner argues that "although the ALJ should have expressly relied on the [vocational expert's] testimony, the record establishes beyond peradventure that, given the RFC assessed, Plaintiff could perform a substantial number of jobs in the national economy." (Dkt. # 15 at 4). Accordingly, the Commissioner contends that remand would be futile. Id. Plaintiff argued in her reply brief that the Commissioner's analysis amounted to nothing more than "an impermissible *post hoc* attempt to correct the ALJ's harmful mistakes." (Dkt. # 16 at 1).

11

The ALJ erred in relying solely on the grids at step five. The regulations limit the use of the grids as the sole source of a finding of "not disabled" at step five and provide that:

> In the evaluation of disability where the individual has solely a nonexertional type of impairment, determination as to whether disability exists shall be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in this appendix 2. The rules *do not direct* factual conclusions of disabled or not disabled for individuals with solely nonexertional types of impairments.

Pt. 404, Subpt. P, App. 2, § 200.00(e)(1) (emphasis added). The Tenth Circuit Court of Appeals has held that reliance solely on the grids is prohibited "unless the claimant's [residual functional capacity] precisely matches the [residual functional capacity] specified for the grid relied upon" in the ALJ's decision. Allen v. Barnhart, 357 F.3d 1140, 1143 (10th Cir. 2004) (citing Haddock v. Apfel, 196 F.3d 1084, 1088 (10th Cir. 1999) and Channel v. Heckler, 747 F.2d 577, 581-82 (10th Cir. 1984)).

Contrary to the Commissioner's assertion, misapplication of the grids is not harmless error. Rather, the Tenth Circuit Court of Appeals has considered it a "critical" error and has specifically rejected application of the harmless error principle under these circumstances. Allen, 357 F.3d at 1143, 1145. See also Lopez v. Barnhart, 78 Fed.Appx 675 (10th Cir. 2003) (unpublished)[9] (finding error in the ALJ's reliance solely on the grids to find a claimant not disabled where claimant was limited to light work with simple instructions and no contact with the public). In Allen, the Court held that the principle of harmless error is available for consideration by a court when the ALJ actually considered the issue but failed to conduct a proper analysis. See id. at 1145. The principle of harmless error cannot apply "on the basis that the missing fact was clearly established in the record. . . ." Id. To permit a court to base a harmless error determination "on legal or evidentiary matters not considered by the ALJ [] risks

---

[9] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

violating the general rule against post hoc justification of administrative action. . . ." Id. (citing SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943)).

In this case, the ALJ did consider the use of vocational expert testimony at the hearing, as evidenced by his decision to call the vocational expert and pose a hypothetical that reflected his ultimate findings with respect to plaintiff's residual functional capacity. That testimony constitutes substantial evidence to support the ALJ's conclusion that plaintiff is not disabled; however, that testimony is not reflected in the ALJ's decision, which references only the grids. Accordingly, the ALJ's error in relying solely on the grids is not harmless and requires remand.

### Medical Source Opinion Evidence

Plaintiff argues that the ALJ made multiple errors with respect to his consideration of the medical opinion evidence in this case. First, plaintiff argues that the ALJ "ignored" a Mental Status Form and Mental Residual Functional Capacity Assessment, as well as plaintiff's GAF scores when evaluating the medical evidence. (Dkt. # 13 at 3-6). Plaintiff then argues that the ALJ failed to properly evaluate Dr. Mallgren's opinions using the regulatory factors, an evaluation that is required even if the ALJ determines that a treating physician's opinion is not entitled to controlling weight. (Dkt. # 13 at 6-7).

**Failure to Consider Evidence**

In considering the medical evidence addressing plaintiff's mental impairments, the ALJ cited a July 2008 letter from plaintiff's care manager identifying plaintiff's diagnosis and current treatment regimen; 2008 medical records from Grand Lake; a Psychiatric Review Technique form completed by an agency psychiatrist; a February 2010 Mental Status Form; and the undated Mental Residual Functional Capacity Assessment signed by the case manager but not by Dr. Mallgren. (R. 17-18). The ALJ does not mention the signed Mental Status Form dated April 2009 in his analysis of the medical evidence.

13

While "an ALJ is not required to discuss every piece of evidence," he is required to "discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996) (citations omitted). An ALJ need not discuss evidence if it is cumulative; however, an ALJ may not "pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability." Martinez v. Astrue, 422 Fed.Appx. 719, 725 (10th Cir. 2011) (unpublished). In this case, the ALJ did consider the February 2010 Mental Status Form but did not consider the April 2009 Mental Status Form. These two forms contain similar reports regarding plaintiff's mental condition and its impact on her ability to function.[10] (R. 478, 527). The undersigned finds that this evidence is cumulative, and the ALJ did not err in relying on the more recent form in analyzing plaintiff's medical records.

The ALJ also did not err in failing to discuss plaintiff's GAF scores. The GAF scores referenced in plaintiff's brief are contained in Grand Lake's treatment plans completed as requests for authorization of funds. (R. 314-21, 462-70). Both of those plans were completed by plaintiff's case manager and are not signed by Dr. Mallgren. (R. 314, 321, 462, 470). A case manager does not qualify as a medical source, capable of rendering a medical opinion. See 20 C.F.R. §§ 404.1513 and 416.913. For these reasons, the GAF scores do not constitute a medical source opinion, and the ALJ did not err in failing to address them specifically in his decision.

Finally, the ALJ did not err in failing to consider the Mental Residual Functional Capacity Assessment form as a medical opinion from Dr. Mallgren. The form was undated and

---

[10] Dr. Mallgren also concludes in both documents that plaintiff is unable to work, although the February 2010 form indicates that plaintiff could work but for the possibility of future episodes of decompensation. Relying solely on these conclusions, it appears that the ALJ improperly ignored the April 2009 form in favor of the form that was more favorable to a finding of disability. However, the issue of a claimant's ability to return to work is an issue left to the Commissioner, and a treating physician's opinion on an ultimate issue is "never entitled to controlling weight or special significance." See 20 C.F.R. §§ 404.1527(d) and 416.927(d); SSR 96-5p. Accordingly, the ALJ did not err in failing to discuss the April 2009 Mental Status Form.

14

was signed by plaintiff's case manager but not by Dr. Mallgren. Courts are split on the issue of the value to be given to unsigned medical opinions. The Ninth Circuit Court of Appeals has accepted an ALJ's decision to give little weight to an unsigned medical opinion when the ALJ also cited the unsigned opinion's inconsistency with other evidence in the record. See Mercer v. Astrue, 319 Fed.Appx 625, 626 (9th Cir. 2009) (unpublished). At least one district court has held that an ALJ may *not* rely on an unsigned opinion. See Felipa v. Astrue, 2011 WL 4520772, *4 (E.D.Pa. August 31, 2011) (unpublished). Other courts have found that an unsigned opinion constitutes an ambiguity, requiring the ALJ to contact the treating physician and resolve the issue. See Gresham v. Astrue, 2007 WL 3208554, *10 (S.D.Iowa September 28, 2007) (holding that the ALJ has an absolute duty to develop the record by contacting the physician to whom the unsigned opinion is attributed for confirmation, even where authorship is not in question); Horton v. Barnhart, 2004 WL 514759, *3 (S.D.N.Y. March 15, 2004) (remanding the case for the ALJ to investigate whether claimant's treating physician authored an unsigned opinion because the document "may have been medically valid and relevant to the ALJ's determination.") The Tenth Circuit has not addressed this question.

After reviewing the case law and the facts of this case, the undersigned agrees with the principle that the lack of signature on an unsigned medical source opinion is only relevant to the extent that

> it may be impossible to identify an unsigned opinion as a medical opinion because it may be impossible to determine whether it is from an "acceptable medical source" as required by the regulations; or that it may be impossible to identify the period to which an undated opinion applies in determining the onset date of an impairment or of disability.

Peckham v. Astrue, 780 F.Supp.2d 1195, 1204 (D.Kan. 2011). In this case, the authorship of the opinion is not in question. During the hearing, plaintiff's attorney used the unsigned form as the basis for his hypothetical to the vocational expert. (R. 54-55). Plaintiff's attorney specifically

stated that plaintiff's "*counselor*" completed the form. (R. 55) (emphasis added). Plaintiff has already acknowledged that Dr. Mallgren did not complete the form; therefore, plaintiff cannot now claim that the form represents Dr. Mallgren's opinion unless it bears his signature, as the two Mental Status Forms did.

Because the record, developed at the hearing, clearly indicated that the Mental Residual Functional Capacity Form was completed and signed by plaintiff's case manager and not by Dr. Mallgren, the undersigned also finds that, under the circumstances of this case, the ALJ was not required to contact Dr. Mallgren to determine whether it was his opinion. In a social security disability case, the claimant has the burden of proving disability and "must furnish medical and other evidence of the existence of the disability." Branum v. Barnhart, 385 F.3d 1268, 1271 (10th Cir. 2004) (citing Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.ed.2d 119 (1987)). Because disability proceedings are not adversarial, however, the ALJ has a duty to adequately develop the record to address the issues raised during the hearing. See id. When a claimant is represented by counsel, however, "the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." Hawkins v. Chater, 113 F.3d 1162, 1167 (10th Cir. 1997). Plaintiff's counsel stated that plaintiff's case manager completed the form, and the ALJ did not err in relying on counsel's statement as to the authorship of the form.

**Treating Physician's Opinion**

Plaintiff argues that the ALJ failed to mention Dr. Mallgren's specialty and mischaracterized the nature of the treating relationship. (Dkt. # 13 at 6). Further, plaintiff argues that the ALJ's reasons for rejecting the opinion are not clear. (Dkt. # 13 at 7). The Commissioner admits that the ALJ's explanation is cursory but argues that it is sufficient to support the decision to reject Dr. Mallgren's opinion. (Dkt. # 15 at 5).

16

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hackett v. Barnhart, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, he is required to explain his reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for disregarding a treating physician's opinion); Thomas v. Barnhart, 147 Fed.Appx 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

In determining whether the opinion should be given controlling authority, the analysis is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. Watkins, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. Id. "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id.

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. §§ 404.1527 and 416.927. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1301 (citing Drapeau v. Massanari, 255 F.3d 1211, 1213 (10th Cir. 2001)).[11] The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. Id. (citing 20 C.F.R. § 404.1527(d)(2)). If the ALJ rejects the opinion completely, he must then give specific, legitimate reasons for doing so. Id. (citing Miller v. Chater, 99 F.3d 972, 976 (10th Cir. 1990)). The reasons must be of sufficient specificity to make clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. Anderson v. Astrue, 319 Fed. Appx. 712, 717 (10th Cir. 2009) (unpublished)[12].

In this case, the ALJ does not state what weight he gives to Dr. Mallgren's opinion. He appears to accept Dr. Mallgren's findings with respect to plaintiff's daily activities and her "ability to remember, comprehend and carry out simple instructions on an independent basis." (R. 18). He then addresses the Mental Residual Functional Capacity Assessment signed by the case manager but not by Dr. Mallgren, finding that it was not supported by the objective medical evidence. Id. To the extent that the ALJ considered the regulatory factors, he focused on the nature of the relationship, namely that Dr. Mallgren simply provided medication management to plaintiff. Id. Based on this evidence, the ALJ's opinion is not clear and requires remand.

## Credibility

Finally, plaintiff argues that the ALJ failed to conduct a proper credibility analysis. Specifically, plaintiff argues that the ALJ's analysis is nothing more than boilerplate language

---

[11] These are the same regulatory factors that plaintiff cites as the "Goatcher factors" in his brief.

[12] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

that fails to state specifically what evidence the ALJ considered true and untrue. (Dkt. # 13 at 7-10). Plaintiff also argues that the ALJ did not consider plaintiff's complaints of pain or the side effects of her medication. (Dkt. # 13 at 9-10). The Commissioner argues that plaintiff is attempting to re-weigh the evidence and contends that the ALJ's credibility determination is supported by substantial evidence. (Dkt. # 15 at 8-10).

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

Plaintiff's "boilerplate language" argument fails in this case because boilerplate language is insufficient to support a credibility determination only "in the absence of a more thorough analysis." Hardman, 362 F.3d at 679. In this case, the ALJ conducted a more thorough analysis. The ALJ noted that plaintiff testified, in response to a direct question, to having only one side effect from her medication: dry mouth. (R. 17). With respect to plaintiff's complaints that she could not concentrate, the ALJ did give credence to those complaints by limiting plaintiff to simple tasks in his residual functional capacity findings. (R. 16). Plaintiff's complaints of pain

19

were limited to a statement that she did not sweep, vacuum, or mop because it caused her "stomach pain." (R. 17). The ALJ rejected those complaints in light of the overwhelming evidence that plaintiff was physically capable of performing medium work, and plaintiff has not challenged those findings.[13] These specific findings support the ALJ's conclusion that plaintiff's complaints were not totally credible.

## CONCLUSION

For the above stated reasons, this Court **REVERSES** and **REMANDS** the Commissioner's decision denying benefits. On remand, the ALJ shall conduct a new step five analysis, incorporating the testimony of the vocational expert. The ALJ shall also clarify what weight he gives to Dr. Mallgren's opinion, applying the regulatory factors. The ALJ's decision is, otherwise, affirmed.

SO ORDERED this 12th day of September 2012.

_____
T. Lane Wilson
United States Magistrate Judge

---

[13] The undersigned finds it inconsistent for plaintiff to accept the finding that she was capable of performing medium work but to challenge the credibility analysis on the grounds that pain could possibly prevent plaintiff from performing medium work.